

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 22, 2021

**BY EMAIL**

The Honorable Stewart D. Aaron
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    <u>United States v. Sina Moayedi</u>, 21 Mag. 5598

Dear Judge Aaron:

The Government respectfully submits this letter in advance of the presentment of—and anticipated bail argument about—defendant Sina Moayedi ("Moayedi" or the "defendant"). Moayedi was arrested on a criminal Complaint on May 28, 2021 in the Western District of Virginia and ordered detained (over the defense's objection). This will be Moayedi's first appearance in the Southern District of New York. For the reasons detailed below, the Government seeks Moayedi's continued detention, as it respectfully submits that there are no conditions or combination of conditions that will reasonably assure his appearance as required.

Moayedi is the very essence of a flight risk. He is a dual citizen of the United States and Iran; he has misrepresented his citizenship to the United States Government; he has traveled abroad extensively, to at least 37 countries—including some with which the United States does not have an extradition treaty; in the past seven years alone, he has spent more than 200 days abroad (in total); he has extensive foreign contacts; he has foreign property; he has close ties to Iran, appears to own property in Iran, and has undisclosed travel to Iran; he has significant net worth; he is a master forger; he has previously perjured himself; he has lied to the United States Government repeatedly where it serves his purposes; he has engaged in sham transactions; he faces overwhelming evidence in this case; and his current Guidelines exposure is massive—and indeed would be life imprisonment, but for the (current) statutory maximum penalty of 75 years' imprisonment. In short, he has the incentive, ability, means, foreign citizenship, and foreign connections to flee. Moayedi should be detained.

**I. Factual Background and Procedural History**

On May 28, 2021, Moayedi was arrested on a three-count criminal Complaint, which charged him with wire fraud, wire fraud conspiracy, and bribery of a public official. As noted in the Complaint, Moayedi founded a construction company, Montage, Inc. ("Montage") in 1986, and has controlled it ever since. Montage is a U.S.-based business that is primarily involved in worldwide Government construction projects, including embassies, military posts, consulates, and similar overseas properties owned and operated by the United States Government. Montage has performed (or at least billed the government as though it performed) over $220 million in

Hon. Stewart D. Aaron                                                                                          June 22, 2021
United States Magistrate Judge                                                                                        Page 2

contracting work for the U.S. Government, including for the Department of Defense, the Department of Justice/Federal Bureau of Investigation, the State Department, the Department of the Interior, the Department of Agriculture, the National Aeronautics and Space Administration, the Equal Employment Opportunity Commission, and the Department of Veterans Affairs. Since 2014, Montage appears to have focused primarily on competing for and obtaining contracts with the State Department. During that period, the State Department has awarded Montage approximately six overseas U.S. Embassy/Consulate construction project contracts totaling about $100 million, in locations such as Ecuador, Spain, Sudan, the Czech Republic, and Bermuda.

Moayedi is charged for his involvement in two schemes. *First*, from at least 2014 to September 2020, Moayedi and Montage made material misrepresentations to the State Department in order to secure approximately $100 million in construction contracts. Moayedi and Montage lied about (among other things) ownership, financial condition, personnel, having the qualifications necessary to complete construction projects, and whether the architect had in fact approved architectural plans.

With respect to ownership specifically, Moayedi lied that Montage was a female-owned business in order to secure unmerited advantages in the bidding process. It is advantageous to a company, when bidding for federal government contracts, to be majority-owned by an individual from a socially or economically disadvantaged community. In fact, certain contracts (or portions of contracts) are "set aside" for—*i.e.*, only available to—such companies. Moayedi and Montage repeatedly represented falsely, in submissions to the State Department, that Montage was female-owned, or female-owned and minority-owned, in order falsely to induce the State Department to award Montage lucrative construction contracts. These were lies. In actuality, Moayedi controlled Montage and made all material decisions on Montage's behalf. As Moayedi revealed to a bank that inquired about Montage's ownership status, "I am the sole owner and president of Montage and have always been."

Montage and Moayedi also repeatedly misrepresented the qualifications of Montage employees. State Department construction contracts typically contain mandatory requirements concerning the requisite skills, training, and job experience for the principal individuals employed by the firm awarded the contract. As part of the bidding process, bidders are required to disclose their employees' qualifications to the State Department in order to allow the State Department to assess the bids. As noted, United States servicemen and women, diplomats, and other Government employees live and work in the buildings that Montage was paid to construct. Accordingly, it is crucial that qualified individuals in fact perform this work. But Moayedi directed subordinates to falsify documents and overstate qualifications in order to meet State Department and contractual requirements for minimum experience in certain key positions. For example, Montage submitted an individual for the key role of Project Controls Engineer and Safety/Health Program Manager. In the claimed experience for this individual, it stated that he had been employed at Montage since 2008 and had "inspected emergency egress and life/safety issues" and conducted "inspections of asbestos containment." In fact, this individual had only been employed at Montage for approximately one year and had performed none of those duties; he had merely served in an office staff capacity. Moayedi told this employee, in substance and in part, that he was going to falsify this employee's resume in order to make him appear qualified for this position.

Hon. Stewart D. Aaron  June 22, 2021
United States Magistrate Judge  Page 3

*Second*, Moayedi is charged in connection with a bribery scheme. Moayedi paid a State Department insider ("Insider-1") at least $60,000 in exchange for confidential bidding information. Insider-1 works in the State Department's Overseas Building Operations ("OBO"), which directs the Department's worldwide overseas building program. For overseas construction projects, the State Department has a Technical Evaluation Panel ("TEP") consider all aspects of a bidder's plan. The TEP has the power to disqualify a bidder. Insider-1 oversaw the TEP for the Hamilton, Bermuda project—a project that was ultimately awarded to Montage. In at least 2016 and 2017, Moayedi paid cash to Insider-1 in exchange for confidential bidding information relating to this multimillion-dollar Bermuda contract, for which Montage was then bidding. During a May 20, 2021 interview with law enforcement agents, Insider-1 admitted giving confidential information to Moayedi, and receiving $60,000 in cash in return (which was paid through intermediaries).

As noted, Moayedi was arrested on May 28, 2021. Following Moayedi's arrest, he was ordered detained in the Western District of Virginia, following a bail argument there.

## II. Applicable Law

As the Court is aware, under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a risk of flight or a danger to the community. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence, while a finding of dangerousness must be supported by clear and convincing evidence. *See, e.g., United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including his "character," "financial resources," and "past conduct"; and (4) the seriousness of the danger posed by the defendant's release. 18 U.S.C. § 3142(g). Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1). Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer. *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000).

## III. The Defendant is a Severe Flight Risk

The combined force of various factors render Moayedi an extreme flight risk: (1) he has Iranian citizenship (in addition to U.S. citizenship); (2) he has misrepresented his citizenship to the United States Government; (3) he has traveled abroad extensively; (4) he has extensive foreign contacts; (5) he has foreign property; (6) he has significant net worth; (7) he is a master forger; (8) he has previously perjured himself; (9) he has lied to various entities within the United States Government when it suits his purposes, including when he is under oath; (10) he has engaged in sham transactions; (11) he faces overwhelming evidence in this case; and (12) his current Guidelines exposure is massive. In short—as is explained in the next three subsections—Moayedi has the incentive to flee, the ability to flee, and he cannot be trusted.

### A. Moayedi's Incentive to Flee

Strength of the Evidence: The State Department has been investigating Moayedi for more than three years, has executed more than ten search warrants, has seized more than 50 electronic devices, and has interviewed more than 30 witnesses—including more than ten current or former employees of Montage, a number of whom have implicated Moayedi (and themselves) in Moayedi's criminal schemes. The evidence against Moayedi is overwhelming. It includes, among various other things, Moayedi's own statements, emails, text messages, security background check forms, statements to his primary bank, written representations to the State Department, and representations to the IRS. As the Complaint makes plain—and as Moayedi himself has admitted—Moayedi controlled and ran Montage since he founded it in 1986. The investigation has revealed that Moayedi and Montage lied to the State Department repeatedly, including: lying that Montage is a female-owned small business; lying that Montage's employees have the qualifications necessary to complete the construction projects, such as a fake engineering degree; repeatedly forging an architect's signature and forging a Washington, D.C. business license; supplying the resumes of individuals who did not work for Montage in order to secure a contract; allowing foreign nationals—who did not have a security clearance—unfettered access to classified building plans; and uploading sensitive project plans and drawings to the internet using an unsecured cloud storage service on the internet instead of using the secure system required by the State Department. These are serious crimes with extremely serious implications for United States national security. They also harmed the Government financially, harmed Montage's competitors (who otherwise would have received the business), and left a trail of harm in their wake.

Sentencing Exposure: It is unsurprising, given the magnitude of his crimes, that Moayedi, who is currently 66 years old, currently faces a Guidelines calculation of life imprisonment—although the combined statutory maxima of the current charges is 75 years' imprisonment, which slightly reduces his exposure under the current Complaint.

### B. Moayedi's Ability to Flee

Moayedi's Net Worth: Earlier this month, Moayedi reported a net worth of several million dollars to the court in Virginia, but even that substantial net worth is believed to be an understatement of his actual net worth. A co-conspirator of Moayedi—who participated in Montage and Moayedi's frauds—noted that Moayedi hid assets from the U.S. Government by failing to file FBARS (*i.e.*, reports of foreign bank and financial accounts). Accordingly, the full extent of Moayedi's assets is unknown—but the following *is* known: (1) Moayedi's company received nine figures from the U.S. Government, and (2) Moayedi currently owns (or exercises control over the LLC or Trust which owns) at least five properties in the United States, not including a sixth which he sold for more than $2 million after the Government executed multiple search warrants at Montage offices in September 2020. In addition, even beyond Montage, Moayedi exercises control over two additional corporate entities, even though they are not tied to him on paper.

Moayedi's Experience Moving Money Overseas: Moayedi is expert at moving large sums of cash through international markets. Moayedi, via Montage, has wired money through at least

approximately 29 different countries, including various countries in which Montage has no discernible business interest, such as Canada, Austria, Ireland, Portugal, Romania, and Serbia.

Moayedi's Extensive Overseas Travel: Moayedi has traveled abroad extensively. Moayedi has traveled to at least 37 foreign countries, with visits to every continent but Antarctica. In the past seven years alone, he has traveled to Austria, France, the Philippines, the Bahamas, Great Britain, Germany, Bermuda, Japan, El Salvador, Denmark, Spain, the Czech Republic, Ecuador, Guam, the United Arab Emirates, Saudi Arabia, and various other countries. This does not include his travel to Iran on his Iranian passport, which is discussed separately below. Moreover, Moayedi also spends significant time overseas during these travels. Indeed, during the past seven years alone, Moayedi has spent at least approximately 220 days overseas in foreign countries. For the five-plus years that preceded the COVID-19 pandemic, Moayedi spent more than about 10% of his time abroad.

Moayedi's Strong Ties to Iran: Moayedi was born in Iran and maintains close ties with his native country. He is an Iranian citizen; he is believed to own (or part-own) two properties in Iran; and he has extensive contacts in that country.

At the Virginia bail argument earlier this month, Moayedi sought (through counsel) to downplay significantly the closeness of his ties to Iran. But contrary to defense counsel's assertion, Moayedi is not *persona non grata* in Iran. He is not a dissident, nor is he unwelcome by the current regime. On the contrary, Moayedi retains his Iranian citizenship, as he has occasionally admitted as part of his U.S. national security clearance (while denying it on other occasions).

Moayedi, through counsel, denied to the Virginia court that he had an Iranian passport. However, more than one witness with intimate knowledge of Moayedi's conduct confirmed for the Government that after the death of Moayedi's father, Moayedi traveled to Iran in or around 2008. One Moayedi family member reported to the Government that Moayedi was able to travel to Iran because he has connections in Iran, and in Iran, "connections are everything."[1] It is further understood that in traveling to Iran, Moayedi did so on an Iranian passport. Indeed, when the State Department queried its travel records, investigators found no record of Moayedi's travel to Iran, despite his extensive travel history elsewhere. Moayedi would have been required to obtain a visa if he was going to travel to Iran on a U.S. passport. Ultimately, multiple witnesses confirmed that Moayedi traveled to Iran at least in 2008, and given the lack of U.S. travel records, Moayedi could only have entered Iran on an Iranian passport that he did not disclose to the U.S. Government. Moayedi also did not report this trip to Iran as part of his U.S. security clearance process, making him a serious security risk.

Contrary to his assertions at the Virginia bail hearing—in which Moayedi represented that his ties to Iran were "essentially severed" after his parents died—Moayedi's involvement with Iran continued thereafter. Witnesses have informed the Government that the Moayedi siblings—

---

[1] For example, this same witness reported to the Government that the Moayedi matriarch was once jailed in Iran, but using their connections, the Moayedi family was able to have their mother released from prison and was able to smooth over the situation.

including the defendant—purchased a condominium for their mother in Tehran. When this condominium proved unsuitable, however, the Moayedi siblings reportedly purchased a *second* condominium, also in Tehran. Although the Government does not have ready access to Iranian property records, it is believed that Moayedi is the owner or the part-owner of both condominiums. A co-conspirator ("CW-1"), who is a former longtime Montage employee, confirmed to Government investigators that Moayedi has stated that he owns property in Iran, including a condominium.[2] In addition, two witnesses—a Moayedi family member, and CW-1—have also confirmed to the Government that Moayedi's brother (with whom he is close) owns a large farm outside Tehran. Moreover, a search of one of Moayedi's cellphones after it was seized in September 2020 confirmed that Moayedi maintains a contact list with the cellphone numbers of more than twenty individuals with a "+98" prefix in their cellphone number (Iran's country code), which means that these individuals communicate using Iranian cellphones (or Iranian landlines).

To take one example, in 2017, Moayedi exchanged messages with an individual believed to be in Tehran. They messaged using Telegram, an encrypted messaging service that Moayedi used prolifically. They communicated in Farsi, but a preliminary (computer-assisted) draft translation shows the Iran-based male ("IM-1") thanking Moayedi "for your kindness regarding loans and expenses to buy a house. I really appreciate you." A few messages later, IM-1 added that he hoped that "one day together we can start a project either in Iran or the United States. Meanwhile, the weather in Tehran is warm like your own." IM-1 added, "I'm always at your service." Moayedi then expressed awareness that IM-1 was not in the United States, noting that it would be great if IM-1 "could come here to the US and we do a project here together."[3]

Moayedi's close contacts with Iran are particularly concerning. Given Moayedi's friendly posture with the Iranian regime, there is a significant risk—given that he is charged, faces overpowering evidence, and faces substantial prison time in the United States—that he will flee and ultimately make his way to Iran. Iran has no extradition treaty with the United States. (*See*, *e.g.*, https://www.loc.gov/law/help/extradition-of-citizens/chart.php). Given Moayedi's ability to move freely in Iran without hindrance by Iranian authorities, and his proven ability to move large sums of money,[4] Moayedi could live comfortably in Tehran—or in any location in Iran—and

---

[2] CW-1 admitted that he engaged in multiple financial frauds at the direction of Moayedi. CW-1 is cooperating with the Government in the hopes of obtaining leniency. To date, the information that CW-1 provided has been extensive, relevant, reliable, and corroborated by independent evidence, including but not limited to other witnesses and corporate financial documents.

[3] Moayedi and Montage also covertly employed a female Iranian national who is not a U.S. citizen ("IF-1")—but who appears to be a relative of IM-1. Montage disguised IF-1's employment by having her assume the identity of *Moayedi's wife*, who is a U.S. citizen. This gave IF-1 access to (among other things) a sensitive but unclassified Government information system. Moayedi's emails confirm that he knowingly employed IF-1 and that she repeatedly used an email address associated with the name of Moayedi's wife. As recently as at least 2020, IF-1 held an Iranian passport, which she used to enter and exit the United States.

[4] Indeed, the investigators in this matter have learned that approximately ten years ago, the Federal Bureau of Investigation ("FBI") interviewed Siakzar Moayedi, Moayedi's brother. The interview

never have to worry about the risk that he would be returned to the United States. Nor would there be any language barrier, as multiple witnesses have confirmed that Moayedi and his family members speak fluent Farsi and use that language to communicate when they do not want anyone else to know what business they are discussing.[5]

Lastly, Moayedi's ability to travel in and out of Iran without hindrance demonstrates that, at a minimum, he is a "friend" of the regime. For example, the State Department currently rates Iran as a "Level 4: Do Not Travel" destination for American citizens (and has rated it as such for many years), and reports the following: "U.S. citizens visiting or residing in Iran have been kidnapped, arrested, and detained on spurious charges. Iranian authorities continue to unjustly detain and imprison U.S. citizens, particularly dual national Iranian-Americans--including students, journalists, business travelers, and academics--on charges including espionage and posing a threat to national security. Iranian authorities routinely delay consular access to detained U.S. citizens and consistently deny consular access to dual U.S.-Iranian citizens."[6] If Moayedi were a "typical" dual Iranian-American citizen, he would be at particular risk if he traveled back to Iran. But he is not typical; he appears well-connected and a friend of the regime. As described above, there is evidence indicating that Moayedi may have secretly held an Iranian passport, traveled to Iran, and maintained property there, for numerous years—all proof that Moayedi has repeatedly lied to the United States Government by suggesting that he still holds Iranian citizenship only because it would allegedly be difficult to renounce it.[7]

<u>Moayedi Owns Other Foreign Property, Too</u>: Moayedi also owns the following property at Pigeon Cay, on Cay Cat Island ("Cat Island") in the Bahamas, which Moayedi refers to as "my beach house" in this 2017 email:

---

was precipitated by Siakzar's transfer of a large sum of money from Iran into the United States, which was said to be Siakzar's share of what the Moayedis' father left their family. One witness, who had knowledge of the FBI interview, asserted that the agents were curious as to how Siakzar was able to the transfer the money into the United States, all while evading OFAC sanctions. The answer, according to this witness, was that the Moayedi family has the right connections in Iran.

[5] Indeed, the Government obtained Moayedi's prison calls while he was detained in Virginia, which included discussions with Moayedi's brother in Farsi in which the words "Bahamas" were discussed. The Government is in the process of having these calls translated.

[6] See https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/iran-travel-advisory.html.

[7] In his most recent statement, to the Virginia court, Moayedi's counsel "dispute[d] that [Moayedi] still retains Iranian citizenship," noting that Moayedi "regards" himself as "no longer a citizen." 6/1/2021 Bail Hearing Tr. at 24:14-19.



Following Moayedi's false assertion to the Virginia court that he owned no overseas property, the Government recently spoke to the property manager of the Cat Island property, who confirmed that Moayedi remains the owner of the home. Bahamian property records confirm this fact, as well. In a search of Moayedi's email, the Government located the tax bill for the Cat Island property in Moayedi's name, attached hereto as Exhibit A. It shows that in 2019, Moayedi paid $565.63 in taxes to Bahamian authorities for his "owner-occupied" property on Cat Island. *See* Exh. A.

Moreover, a search of the devices seized in September 2020 shows that Moayedi has at least 10 separate entries in his cellphone with references to either "Cat" or "Cat Island," including "Cat island Builder" and "Cat Island Draftsman." Also present is an entry for "Devard Smith," listed as "Bahamas Attorney Cat". There is also an entry for the Bahamian Embassy to the United States located in Washington, D.C.

Indeed, the Government has found evidence that Moayedi was potentially seeking to conceal his ownership of the Cat Island property while he was embroiled in contract litigation with the State Department in 2019. For example, Moayedi contacted multiple people in the Bahamas,

including the U.S. Embassy in Nassau, Bahamas, in order to obtain a local contact for someone who could facilitate changing the name on the deed of property.  Two such examples of these communications are attached hereto as Exhibits B and C, although there are others, as well.  In the first, Moayedi writes: "I am a neighbor at the pigeon cay and you helped with my title settlement many year ago, I would like to change the name on my deed to my grand son and I was hoping g [*sic*] to ask you for help."  *See* Exh. B.[8]  In the second email, Moayedi writes: "I received your referral from the U.S Embassy in Bahamas. I have a property in Cat Island and I like to find out how I can either add or transfer the title to a family member please?"  *See* Exh. C.

There is no evidence that Moayedi was able to effectuate such a transfer.  Tellingly, but not surprisingly, Moayedi declined to correct the record when his lawyer, in Virginia, stated inaccurately that Moayedi owned no overseas property.[9]  In the email quoted above, Moayedi also lied about his purported "grand son," who does not exist; Moayedi was clearly laying the groundwork for an intended transfer of the Cat Island property to a nominee or alter ego, by putting the property in someone else's name but permitting Moayedi to continue to maintain control over, and access to, the property.  Notably, Moayedi did not state that he intended to *sell* the property, but rather, he merely sought to transfer title of it to a close relative (who did not in fact exist).

In addition, on his cellphone seized in September 2020, the Government found evidence that Moayedi was conducting repeated internet searches for sailing time from Florida to Cat Island ("*sail time calculator florida to cat island bahamas by boat*"; "*sail time calculator florida to bahamas by boat*"; "*sail time calculator bahamas*").  Whether Moayedi intended this "research" to form part of an escape plan, or simply because he was planning an extended sailing excursion, it is clear that Moayedi knows that he could travel to Florida and then easily leave the country on a chartered vessel.  Once he departed Florida, a boat could take Moayedi anywhere, and unlike an airplane, it would be nearly impossible for U.S. maritime authorities to track Moayedi's departure from the United States, or his subsequent whereabouts, if he traveled via a chartered boat.  Moayedi could reach the relative safety of Bimini (the closest point in the Bahamas to Miami) after sailing just 53 miles.  And his private home at Cat Island—which Moayedi deliberately failed to disclose to the federal court in Virginia—is a mere 260 sailing miles beyond Bimini.  Once in the Bahamas, Moayedi could use his forgery skills—discussed in greater detail below—to assume a new identity, or could use his extensive foreign contacts and overseas knowledge to make his way to a "safe" third country, or even travel to Iran, all under the radar and beyond the reach of U.S. authorities.

---

[8] This, too, is a lie, because Moayedi is not known to have a grandson.  Indeed, the child dependents he claims on his IRS tax return are all preteens and therefore are too young to have had children.  Moreover, numerous witnesses the Government have spoken to have confirmed that Moayedi does not have a known grandson.

[9] The Government does not attribute any such falsehoods to Moayedi's attorney, Mr. Burnham.  In fact, the Government notes that several times during the Virginia bail hearing, Moayedi and Mr. Burnham conferred in a separate "break out" room—and at no time after those breaks did Moayedi undertake to correct any statements that he had allowed his lawyer to make.

Hon. Stewart D. Aaron  June 22, 2021
United States Magistrate Judge  Page 10

     In addition, preliminary investigations have revealed that Moayedi purchased property in the south Pacific island of Palau, at a time when Montage was fulfilling a contract to build the U.S. embassy there in the 2000s. At least three witnesses confirmed that Moayedi owned property in Palau, and one (CW-1) informed the Government that Moayedi had invited CW-1 to travel to Moayedi's property in Palau.[10] Finally, the Government believes that Moayedi may have also owned property in the Philippines. The Government continues to investigate these claims, and is attempting to ascertain whether Moayedi still owns the Palau or Philippines properties. However, even if he sold these properties or divested himself of them, they are another instance in which Moayedi clearly failed to disclose his ownership interest in foreign property as part of his U.S. security clearance.

     Given these facts, no number of co-signers, no bond, and no electronic monitoring can safely ensure that Moayedi will not use the considerable means at his disposal to flee to any one of several preferred destinations, which include the Bahamas, Iran, Palau, and the Philippines.[11] Indeed, defendants unfortunately cut their ankle bracelets and flee; in such a situation, Pretrial Services receives a notification but gets a late start—and lacks authority to arrest. *See*, *e.g.*, *United States v. Concepcion Aquino et al.*, 18 Cr. 640 (RA) (at least four defendants in same case cut their ankle bracelets and fled, each on a different occasion; each remains at large).

    C.  <u>Moayedi Is Not to be Trusted</u>

     With respect to his "character" (*see* 18 U.S.C. § 3142(g)(3)(A)), Moayedi simply cannot be trusted. The Government's investigation has revealed that Moayedi's business affairs with Montage are built on a mountain of lies to the State Department as well as to other governmental agencies and businesses. Below is only a small sample of Moayedi's lies, misrepresentations, and forgeries discovered in connection with this criminal case:

- <u>Lies to the State Department</u> (18 U.S.C. § 1343): Moayedi lied to the State Department about the location of Montage's office, lied about whether Montage was a woman-owned company, lied about whether Montage's employees have the qualifications necessary to complete the construction projects, lied about whether the architect of record had approved the architectural designs, lied about the reason that Montage raised the price of its bid for the Bermuda project (*i.e.*, his possession of confidential inside information), and lied about whether Montage used an unauthorized cloud storage service instead of submitting architectural renderings and other materials to the State Department using the secure system that was required.

- <u>Lies Under Oath – Perjury</u> (18 U.S.C. § 1623): Moayedi perjured himself during prior federal civil proceedings in connection with Montage. For example, in a sworn civil deposition taken on or about November 13, 2019, Moayedi claimed that a particular

---

[10] The Government also notes that it has obtained an unsigned copy of Moayedi's will, which lists dispositions for property he purported to own in Iran, the Bahamas, Palau, and the Philippines.

[11] Moayedi's second wife is from the Philippines.

| | |
|---|---:|
| Hon. Stewart D. Aaron | June 22, 2021 |
| United States Magistrate Judge | Page 11 |

woman—referenced in the criminal Complaint as "W-1"—had been the president of Montage "ever since" 2002. As the Complaint makes clear, this assertion is plainly false—and is contradicted by other representations that Moayedi made. In 2016, for instance, Moayedi told his primary bank ("Bank-1") that: "**I am the sole owner and President of Montage and have always been**" (emphasis added).

- <u>Lies on His Security Clearance Forms</u> (18 U.S.C. § 1001): Moayedi has made various false statements in the security clearance process required to gain access to classified Government information, including (but not limited to) false statements regarding his ownership of Montage, his dual citizenship, his possession of a foreign passport, his travel to Iran, and his children's citizenship status. Among the false statements discovered in Moayedi's security clearance applications and associated interviews are the following:

    *Ownership*
    o In his 2016 form, Moayedi claimed to be the Vice President of Montage.

    *Dual Citizenship/Foreign Passport/Travel to Iran*
    o In 2011, Moayedi claimed to an investigator that he had relinquished his Iranian citizenship on March 12, 1991 and had *never* held multiple citizenships.
    o But in his 2013 form, Moayedi represented that he was *never* able to renounce his Iranian citizenship because it is a difficult process to do so. He also stated that his Iranian passport expired in 1974 or 1975.
    o In 2013, Moayedi represented that he had not traveled back to Iran since immigrating to the United States in 1973. He did not report his 2008 travel to Iran.
    o In his 2020 form, Moayedi told yet another story: He claimed that he has *never* held dual citizenship with another country, nor had he *ever* been issued a passport by a country other than the United States.

    *His Children's Citizenship*
    o As to his children's citizenship, in 2011, Moayedi stated that his children do *not* hold dual citizenship.
    o In 2013, however, Moayedi admitted that his children were citizens of the Philippines, stating, "They will have to make a decision as to whether or not to renounce when they come of age."
    o Yet in his 2020 forms, Moayedi again claimed that his children are citizens of only the United States.

- <u>Lies to the IRS and Bonding Companies</u> (26 U.S.C. § 7201, 18 U.S.C. § 1343): CW-1 informed the Government that, at Moayedi's direction, Montage kept four different sets of books and records, depending on to whom Montage submitted these financials—*e.g.*, the IRS, Bank-1, and bonding companies.[12] For instance, the financials submitted to bonding companies *overstated* Montage's income and showed more cash-on-hand than Montage

---

[12] Generally, all State Department projects require a bond or a surety, the cost of which is borne by the contractor, and which is intended to guarantee satisfactory completion of the project.

actually had, which lowered the cost of Montage's construction bond. By contrast, filings submitted to the IRS *understated* income, in order to reduce tax obligations. CW-1 showed the Government two versions of the same tax filing for tax-year 2016. In the version that Moayedi submitted to Bank-1 in connection with maintaining his line of credit, Moayedi reported earning approximately $2.6 million in income. However, in the version of the form which Moayedi submitted to the U.S. Government, Moayedi reported earning only approximately a fraction of that—approximately $375,000—which, of course, would have reduced his tax obligation. The Government interviewed another longtime co-conspirator of Moayedi's, who reiterated that Moayedi routinely made misrepresentations in tax filings to the IRS, generally to reduce tax obligations, but in some instances, to ensure the appearance of consistent profitability in order to reduce the odds of an audit.

- Moayedi is a Master Forger (18 U.S.C. § 1028A): Moayedi is skilled at falsifying documents and stealing identifications. As part of the scheme alleged in the Complaint, Moayedi has stolen resumes and identities, forged architect signatures and stamps, perjured himself, falsely certified documents, used a forged Washington, D.C. business license, and allowed individuals at his company to assume identities in order to evade vetting by the Government. As CW-1 explained to the Government, Moayedi is a "master forger." CW-1 described how Moayedi and another Montage employee electronically altered Bank-1 documents in order to alter bank account balances, and then provided those altered documents to bonding companies. CW-1 also stated that Moayedi and others had forged resumes used in connection with bidding Government contracts. CW-1 also noted that Moayedi possessed a notary stamp in the name of a woman, which Moayedi used when necessary, including in submitting forged records to a bank and to the State Department. CW-1's statements are consistent with another former employee's statement that Montage kept a "bank" of resumes that it used to meet contractual requirements (even though those individuals did not work at Montage).

- Misrepresentations to the Court: At the bail argument in Virginia, Moayedi allowed his lawyer to represent, inaccurately, that Moayedi owned no property abroad. (6/1/2021 Bail Hearing Tr. at 14 ("*He has no close family abroad, owns no property*.")) Likewise, Moayedi allowed his lawyer to represent, inaccurately, that Moayedi's ties with Iran were "essentially severed" after his parents died. *Id.* Undoubtedly, the source of these inaccurate statements to the Court was Moayedi himself.

Moayedi simply cannot be trusted, and for that reason as well, no set of conditions will ensure his appearance in Court.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that Moayedi continue to be detained.[13]

Respectfully submitted,

AUDREY STRAUSS
United States Attorney
Southern District of New York

By: _____/s/_____
Michael D. Neff / Louis A. Pellegrino
Assistant United States Attorneys
(212) 637-2107/2617

cc:   Defense Counsel (by email)
      Pretrial Services Officer Keyana Pompey (by email)

---

[13] The Government respectfully requests permission to file this letter via email in the first instance, as the SDNY docket appears to be sealed at this time. Once the defendant arrives in this District and the case is unsealed, the Government will promptly file this letter, and the attached Exhibits, on the docket.

# Exhibit A



Commonwealth of the Bahamas Public Treasury / Department of Inland Revenue

Receipt for Payment of Taxes

Date Receipt Printed:  01/29/2019 21:35:25

Payment Date: 01/29/2019   Effective Date:  01/29/2019

Operator: WEBPYMTS01   Source: WEB

Receipt #:  590128

**Parcel ID:** 0811029   **Grid #:** 09 0000 000 000 001030

**Owner Name:** MOAYEDI SINA

**Mailing Address:** 1829 MONROE ST NW
WASHINGTON DC 20010

**Property Location:** PIGEON CAY CAT ISLAND

**Island Name:** CAT ISLAND   **Primary Class:** OO-Owner Occupied

**Legal Description:** PROPERTY SITUATED AT
PIGEON CAY IN THE NORTHERN
DISTRICT OF CAT ISLAND.

**TRANSACTION TOTAL: Amount Paid:**   $565.63

| Methods | Amounts | Reference |
|---|---|---|
|  | $565.63 |  |
|  | $0.00 |  |
|  | $0.00 |  |

**Amount Due:**   $628.13

**Amount Paid:**   $565.63  (Discount Applied $-55.56)

**Amount Outstanding:**   $69.44  ($62.50) CR

**RECEIVED FROM:** Sina Moayedi
2011 MINOTT ST.
United States

# Exhibit B

| | |
|---|---|
| **From:** | Sina Moayedi |
| **To:** | |
| **Subject:** | Cat Island |
| **Date:** | Thursday, December 5, 2019 7:08:07 PM |

Hi Maria , I hope you may remember me , I am a neighbor at the pigeon cay and you helped with my title settlement many year ago, I would like to change the name on my deed to my grand son and I was hoping g to ask you for help.

Thanks Again Sina Moayedi


Thanks Sina
Sent from my iPhone

# Exhibit C

| | |
|---|---|
| **From:** | ▮ |
| **To:** | Sina Moayedi |
| **Subject:** | Re: Cat Island Property |
| **Date:** | Tuesday, April 21, 2020 4:10:41 PM |

Hi Sina.
Unfortunately our offices were destroyed by Hurricane Dorian. Thus I am unable to assist you.
I'm sorry.
Regards.
▮

*Sent from our beautiful Planet Earth...*

> On Apr 21, 2020, at 1:49 PM, Sina Moayedi <sinam@montageinc.com> wrote:
>
> Dear Ms. Hull, I received your referral from the U.S Embassy in Bahamas. I have a property in Cat Island and I like to find out how I can either add or transfer the title to a family member please?
>
> Regards,
> Sina Moayedi
> Tel: 202-483-6722
> Cell: 202-812-8153